**UNITED STATES BANKRUPTCY COURT**

DISTRICT OF SOUTH DAKOTA
ROOM 211
FEDERAL BUILDING AND U.S. POST OFFICE
225 SOUTH PIERRE STREET
PIERRE, SOUTH DAKOTA 57501-2463

IRVIN N. HOYT
BANKRUPTCY JUDGE

TELEPHONE (605) 224-0560
FAX (605) 224-9020

July 20, 2005

Patrick Dougherty, Esq.
Counsel for Plaintiff-Trustee
Post Office Box 1004
Sioux Falls, South Dakota   57101

John C. Quaintance, Esq.
Counsel for Defendant
Post Office Box 2208
Sioux Falls, South Dakota   57101

      Subject:   *Trustee John S. Lovald v. Border Line, Ltd.*
                *(In re James P. and Tammy L. Grinnell)*,
                Adversary No. 05-4006;
                Chapter 7, Bankr. No. 04-41414

Dear Counsel:

    The matter before the Court is Trustee John S. Lovald's complaint against Border Line, Ltd., to recover a constructively fraudulent transfer. This is a core proceeding under 28 U.S.C. § 157(b)(2). This letter decision and accompanying order shall constitute the Court's findings and conclusions under Fed.R.Bankr.P. 7052. As set forth below, a judgment will be entered for Trustee Lovald for $13,172.19.

    SUMMARY OF MATERIAL FACTS. In March 2003, Border Line, Ltd., ("Border Line") sold on contract a convenience store in Luverne, Minnesota, to James P. Grinnell and Tammy Grinnell, husband and wife. The Grinnells were to pay, over several years at 8% interest, $200,000.00 for the land, $200,000.00 for the building, and $150,000.00 for equipment. The parties' agreement provided that Border Line would give the Grinnells a warranty deed once the Grinnells had paid $40,000.00 of the total purchase price. The store's inventory was sold by Border Line to the Grinnells under a separate bill of sale. The purchase price was $40,966.06. The Grinnells paid cash for the inventory.

    After the Grinnells took possession of the store, they purchased some replacement personalty used at the store. This included a new office computer, some software, and a menu board. The Grinnells also purchased and installed video surveillance

In re James P. & Tammy L. Grinnell
July 20, 2005
Page 2


equipment valued at $450.00 and a deli sign valued at $2,300.00.

The store did not prove to be sufficiently profitable for the Grinnells to complete the purchase. On May 21, 2004, the Grinnells gave back to Border Line the real property in Luverne and their interest in the store's "furniture and equipment." The transfer of the real property was memorialized by a quit claim deed. The transfer of the furniture and equipment was memorialized with a bill of sale. The Grinnells also gave up possession of the store's inventory on May 21, 2004. There was no documentation for the inventory transfer.

The Grinnells, Becky Boyd, an employee of Palisades Oil Company ("Palisades Oil"), and an assistant to Boyd inventoried the store on May 21, 2004. They used hand-held scanners for those items that had the requisite coding. Due to technical difficulties, the scanned information was not soon downloaded. The other items were counted by hand. The Grinnells, primarily James, made hand-written notes regarding both the scanned and hand-counted items. James Grinnell also inventoried the fuel at the store. He used the computerized read-out for each tank that was available inside the store.

About five days later, the Grinnells added to James Grinnell's inventory notes some unit prices based on invoices. James Grinnell thereafter gave Boyd his original notes regarding the hand-counted items and he kept a photocopy.

In May 2004, Border Line was owned by Thomas M. Coburn (60%) and Mark A. Garry (40%), and Palisades Oil was owned by Coburn and his wife. As part of its operation, Palisades Oil supplied fuel to convenience stores, including the store in Luverne. Palisades Oil also handled administrative matters, such as payroll, for some convenience stores, including the one in Luverne.[1] The two entities had a common address in Garretson, South Dakota

The Grinnells filed a Chapter 7 petition in bankruptcy on November 2, 2004. On February 17, 2005, the case trustee, John S. Lovald, commenced an adversary proceeding against Border Line to

---

[1] According to Coburn's testimony at trial, on August 1, 2004, Garry sold his shares in Border Line to Coburn, and Coburn became the sole shareholder.

In re James P. & Tammy L. Grinnell
July 20, 2005
Page 3

recover the value of the inventory. He alleged that Border Line had not paid adequate compensation for the inventory and that the transfer was thus voidable under 11 U.S.C. § 548((a)(1)(B). Border Line answered that the value of the inventory that the Grinnells turned over on May 21, 2004, was applied to the debt they owed Palisades Oil for fuel.

A trial was held May 4, 2005. The matter was taken under advisement after the receipt of briefs.

At trial, James Grinnell testified that in February or March 2005, his wife turned his handwritten notes into a formal spreadsheet inventory. He also stated that some time thereafter he lost his notes regarding the scannable items. The spreadsheet set forth a total inventory value of $34,795.79 on May 21, 2004.[2] James Grinnell acknowledged that some numbers on his inventory were likely rounded both up and down.

Grinnell also acknowledged that he and Coburn discussed the status of inventory when the Grinnells gave the store back to Border Line, but Grinnell said he did not have any agreement with Coburn to give Palisades Oil the inventory in partial payment of the Ginnells' large fuel bill. James Grinnell stated he and his wife were not paid anything for the inventory.

Coburn testified that when the Grinnells decided to turn the store back to Border Line, he met with them, and they made an agreement that the value of their inventory would be credited against their fuel bill at Palisades. He acknowledged there was no documentation for this agreement regarding the inventory.

Coburn further testified that after the inventory was taken, he discussed the Luverne store with Garry, his co-shareholder in Border Line. Coburn said Garry did not want to put any more money into the Luverne store. Coburn said he consequently had Palisades Oil give the inventory to Border Line, and Border Line continued to

---

[2] The Grinnells' spreadsheet was received into evidence at the trial. The Court, however, erroneously referred to the spreadsheet on the record as Exhibit "M" rather than Exhibit 8. Exhibit M, a copy of a letter, had been discussed during *voir dire* regarding Exhibit 8 but Exhibit M had already been admitted by stipulation.

In re James P. & Tammy L. Grinnell
July 20, 2005
Page 4


operate the Luverne store "seamlessly." There was no evidence that Palisades Oil timely recorded a credit against the Grinnells' fuel bill. There was no evidence that Border Line gave Palisades Oil any consideration for the Luverne store inventory when Border Line kept the inventory.

Coburn testified that in late August 2004, he met a second time with the Grinnells to ask what plans they had to pay their bill to Palisades. He said they again discussed the inventory and the fact that the scanned items had not yet been downloaded from the scanners. Coburn said he had hoped the meeting would produce an agreement in which the Grinnells would set up a repayment schedule, and he would give them a credit for the inventory they turned over. Coburn acknowledged that no formal agreement was reached.

Boyd also testified at trial. She acknowledged that Coburn sent her and an assistant to Luverne to take an inventory in May 2004. She said scanners were used to inventory the scannable items. Boyd acknowledged that the Grinnells were present during the inventory, that James Grinnell had inventoried the nonscannable items, and that he gave her a list of those nonscannable items. Boyd testified the inventory went well until she tried to download the information from the scanners to a computer.

Kristi Trower testified that she was asked by Coburn in early 2005 to get the Luverne store inventory off the scanners. She said she did so using the computer at the Luverne store. She said she then handwrote inventory totals for each category and printed the last page from the computer to verify her totals. Her inventory of scanned items totaled $8,551.02.[3]

Dave Hauge, who had been an assistant manager for James Grinnell at the Luverne store and who continued as the manager

---

[3] Because the record was unclear, the Court conferred with counsel after the trial to ascertain whether Trower's inventory report (Exhibit K) was supposed to be one or three pages. The possible second page, a soda inventory, was part of a complete scanner report put in evidence based on Joy Peterson's testimony. The possible third page, which was handwritten, was not clearly discussed on the record. Accordingly, the Court did not consider these two pages as part of Trower's inventory.

after Border Line took over from the Grinnells, testified. He said on May 21, 2004, the store's general inventory was very low, they did not have any beer, and they were unable to pump any fuel. He based his fuel assessment on the number of gallons each tank would still hold when the pumps would stop working. Hauge disputed the *value* of some "freezer" items and the *amount* of some food items that James Grinnell had listed on his inventory. He acknowledged he could not, with certainty, vouch for the values set forth on Trower's inventory summary.

Hauge acknowledged he was not present during any conversations between the Grinnells and Coburn. He testified, however, that around the time the Grinnells gave the store back, James Grinnell told him that Grinnell was giving the inventory to Coburn with the value to be applied against the Grinnells' fuel bill with Palisades.

Shirley Akkerman, a long time employee at the Luverne store with Border Line, then the Grinnells, and now again with Border Line, testified she was present when the May 21, 2004, inventory was taken, though she did not help with it. She agreed with Hauge that the store's inventory was quite low when the Grinnells gave the store back to Border Line. She thought the Grinnells' inventory was too high, and she said the store was out of some specific brands of soda pop. Akkerman said some boxes listed on the Grinnells' inventory were not full boxes. She stated she could not remember whether they were selling any fuel on May 21, 2004, though she recalled that at least one pump likely was not working.

Joy Peterson, a Palisades Oil employee, said she produced an inventory of scanned items for the Luverne store on April 28, 2005. She said she downloaded the information, with Trower's assistance, from the scanners used on May 21, 2004. She said her totals for "On Hand" and "Base Cost" columns matched those totals found by Trower in February 2005. The third column, captioned "Total Cost," did not match Trower's. Peterson said that input errors caused some entries in the third column of her inventory to be zero. She said if the cost information had been put into the computer correctly, the "Base Cost" column total, which was $8,551.02, and the "Total Cost" column total should have been the same.

APPLICABLE LAW. Section 548(a) of the Bankruptcy Code allows a trustee to avoid transfers infected by either actual fraud or constructive fraud. *BFP v. Resolution Trust Corp.*, 114 S.Ct. 1757,

In re James P. & Tammy L. Grinnell
July 20, 2005
Page 6


1760 (1994). The trustee must show each element of such voidable transfers by a preponderance of the evidence. *Sherman v. Third National Bank*, 67 F.3d 1348, 1353 (8th Cir. 1995). If the trustee makes a *prima facie* case, the burden of going forward with evidence may shift to the debtor or creditor involved in the transfer to prove some "legitimate supervening purpose" for the transfer at issue. *Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800, 806 (9th Cir. 1994); *First National Bank in Anoka v. Minnesota Utility Contracting, Inc. (In re Minnesota Utility Contracting, Inc.)*, 110 B.R. 414, 418-20 (D. Minn. 1990).

Section 548(a)(1)(B) specifically governs the avoidance of a constructively fraudulent transfer. Under this provision, the trustee must establish that: (1) the debtor had an interest in property; (2) the debtor transferred that interest in property within one year of the date the debtor filed his petition; (3) the debtor was insolvent at the time of the transfer, the debtor became insolvent because of the transfer, or the debtor intended to incur or believed he would incur debts beyond his ability to pay; and (4) the debtor received less that a reasonably equivalent value for the transfer. *See BFP v. Resolution Trust*, 114 S.Ct. at 1760.

There is a three-part analysis to determine whether the debtor received something reasonably equivalent in value in exchange for the transfer: (1) Was value given? (2) Was the value given in exchange for the transfer by the debtor? (3) Was the value reasonably equivalent to what the debtor transferred? *Pummill v. Greensfedler, Hemker & Gale (In re Richards & Conover Steel Co.)*, 267 B.R. 602, 612(B.A.P. 8th Cir. 2001). "Value" in this context means property given in satisfaction or securing of a present or antecedent debt of the debtor. 11 U.S.C. § 548(d)(2)(A).

> The concept of reasonably equivalent value is a means of determining if the debtor received a fair exchange in the marketplace for the goods transferred. Considering all the factors bearing on the sale, did the debtor receive fair market value for the property.

*Jacoway v. Anderson (In re Ozark Restaurant Equipment Co.)*, 850 F.2d 342, 344-45 (8th Cir. 1988)(quoted in *Pummill*, 267 B.R. at 612).

DISCUSSION. There is no dispute that Debtor transferred property -- the convenience store inventory -- and that the

transfer was made while Debtors were insolvent. Border Line further admits the inventory was transferred on May 21, 2004, when Debtors gave up possession of the store. Thus, the transfer was within one year of Debtors' Chapter 7 petition on November 2, 2004. Border Line disputed only two issues.

*Who received the inventory?* Border Line would have the Court find that Debtors made an agreement to give the inventory to Palisades Oil. However, while the Grinnells and Coburn may have had some initial understanding that the inventory value would be credited against the Grinnells' fuel bill with Palisades Oil, that exchange never occurred. In fact, Coburn himself testified that after Garry decided he did not want to put any more money into Border Line to operate the Luverne store, Palisades Oil transferred the inventory to Border Line and the store continued to operate "seamlessly."

No consideration for this inventory was ever exchanged. Coburn did not pay the Grinnells for the inventory on May 21, 2004. Palisades Oil did not document or acknowledge any application of the inventory value against the Grinnells' fuel bill. Border Line did not pay Palisades Oil for the inventory it received, according to Coburn, from Palisades Oil. Instead, Border Line had possession of the inventory from May 21, 2004, forward without paying for it; Border Line sold the inventory to customers from May 21, 2004, forward; Border Line received all the sale proceeds from May 21, 2004, forward; and Border Line never forwarded the proceeds to anyone else. Accordingly, the requirements for avoiding the transfer under § 548(a)(1)(B) have been met.

*What was the value of the inventory on May 21, 2004?* Under § 550(a), Trustee Lovald may recover from Border Line, for the benefit of the bankruptcy estate, the value of the inventory that Border Line received. Based on the Grinnells' inventory, Trustee Lovald calculated the inventory to be worth $34,795.79. This included $20,624.62 for scannable items, $1,377.31 for fuel, $3,243.86 for nonscannable items, and $9,550.00 for a computer, software, video surveillance system, and two signs.

Border Line offered its inventory of the scanned items only, which it said totaled $8,551.02. Border Line presented some testimony that the Grinnells had overstated the quantity of fuel on hand and the inventory of nonscannable items, but it did not offer any definitive evidence of what numbers were correct.

Since the record contains no other assessments regarding the fuel on hand and the inventory of nonscannable items, the Court accepts the Grinnells' inventory for those items. While we agree that the Grinnells' rounding of some numbers regarding those items was not ideal, there is no better record on which to rely.

The Court does not find that the new computer, software, video surveillance system, and signs that the Grinnells purchased in whole or part for the store were transferred to Border Line without adequate compensation. Thus, the value of those items will not be included in Trustee Lovald's recovery. All "furniture and equipment" was transferred from the Grinnells back to Border Line via a bill of sale, and James Grinnell acknowledged that their purchase agreement required them to do so upon default. Except for one sign and the video surveillance equipment, these items replaced equipment that was in the store when the Grinnells took possession. The Court is satisfied that the value of the video surveillance equipment and the one sign, which constituted additions to the store, were offset by Border Line's damages arising from the default and the depreciation in other furniture and equipment that Border Line got back on May 21, 2004.

The more difficult value to determine is the value of the scanned items. The inventory for these items based on the Grinnells' hand-written notes varied widely from the inventory produced by the scanners. For several reasons, however, the Court will accept the inventory produced from the scanners. First, there was no evidence that the scanner operators were inexperienced or inaccurate in their work. Second, the scanners were eventually downloaded using the computer at the store in Luverne. Though the download was not contemporaneous with the time the items were scanned, there was no clear evidence that the scanners produced inaccurate results due to the delay. Third, James Grinnell admitted that he rounded some numbers on his inventory. Finally, the scanner inventory provided good details while the Grinnells' inventory for scanned items provided only total values. The Court did not have the benefit of considering Grinnell's contemporaneous, handwritten notes where the number of items and unit price for the scanned items were set forth.

The Court does not find that either party's evidence regarding the inventory value was more or less credible. The Court's conclusion is based solely on the quality and detail of the records. While some would argue that such circumstances warrant

In re James P. & Tammy L. Grinnell
July 20, 2005
Page 9


"splitting the difference" -- and that would surely be an easy solution -- the Court must instead consider the evidence presented and determine an inventory value based on that record.

Accordingly, the inventory value that Border Line must reimburse the estate under §§ 548(a)(1)(B) and 550(a) is $13,172.19. This includes $8,551.02 for the scanned inventory, $3,243.86 for the hand-counted (nonscannable) inventory, and $1,377.31 for the fuel on hand. An appropriate judgment will be entered.

Sincerely,

Irvin N. Hoyt
Bankruptcy Judge

INH:sh

CC: adversary file (docket original; serve parties in interest)

I hereby certify that a copy of this document was electronically transmitted, mailed, hand delivered or faxed this date to the parties on the attached service list.

JUL 2 0 2005

Charles L. Nail, Jr., Clerk
U.S. Bankruptcy Court, District of South Dakota
By_____

NOTICE OF ENTRY
Under F.R.Bankr.P. 9022(a)
Entered

JUL 2 0 2005

Charles L. Nail, Jr., Clerk
U.S. Bankruptcy Court
District of South Dakota

Patrick T. Dougherty
PO Box 1004
Sioux Falls, SD 57101-1004


John S. Lovald
Trustee
PO Box 66
Pierre, SD 57501


John C. Quaintance
PO Box 2208
Sioux Falls, SD 57101-2208